IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

David Sieving,                          )
                                        )
            Plaintiff,                  )
                                        )
                                        )
     v.                                 )  No. 20-cv-5127
                                        )
                                        )
Continental Casualty Company            )
                                        )
            Defendant.                  )
                                        )

Memorandum Opinion and Order

Plaintiff David Sieving is a California resident insured under a group long-term care policy issued by Defendant Continental Casualty Company ("Continental"). In September 2016, Continental sent a letter to Mr. Sieving informing him that his insurance premium would increase by 95.5%. The letter also provided that due to regulatory requirements that varied by state, the premium increase would likely not be uniformly implemented across insured individuals nationwide. Mr. Sieving initiated the instant putative class-action lawsuit against Continental alleging, inter alia, breach of contract and fraud. Specifically, Mr. Sieving contends Continental was required to make any premium increases consistent across a nationwide class, and further that it was foreclosed from raising premiums at all for insureds, such as Mr.

Sieving, who had purchased inflation-protection coverage in the form of an automatic benefit increase. Continental has moved to dismiss the complaint in its entirety [15]. For the reasons that follow, the motion to dismiss is granted in part and denied in part.

I.

In reviewing the sufficiency of a complaint pursuant to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), I "accept all well pled facts as true and draw all permissible inferences in favor of the plaintiff." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334 (7th Cir. 2012). To survive a motion to dismiss, the complaint must state a claim "that is plausible on its face" after conclusory allegations are disregarded. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)).

Long-term care insurance covers a variety of services for people who become unable to care for themselves, including assistance in the home, adult daycare, assisted living, and nursing home services. Continental, a Delaware corporation headquartered in Illinois, issued and delivered the group long-term care policy at issue, policy number 9774, to the Employees Long Term Care Insurance Trust ("Employees Trust"), located in Illinois, in September 1989. Mr. Sieving, who was an employee of Northrop

2

Grumman Space Systems Division at the time, purchased a certificate under the policy with an effective date of July 1, 2003. Mr. Sieving was able to purchase his certificate because his employer had access to insurance through Northrop Grumman Federal Credit Union Space Systems Division, a participating organization under the policy.

When Mr. Sieving bought his certificate, he purchased inflation protection with an automatic-benefit-increase option. That is, he selected a higher premium of $110.80 per month (more than double what his "base rate" premium would have been), and in exchange, his benefit level automatically increased by 5% each year, compounded annually. The automatic benefit increases had the purpose of helping protect Mr. Sieving against the increasing costs of long-term care over time.

The insurance policy itself included the following language,[1] under the heading "PREMIUM": "We cannot change the Insured's

---

[1] The insurance policy was referred to in but not attached to the complaint. However, Continental appended a copy of the policy to the motion to dismiss. While a document central to and referred to in the complaint may often be considered on a motion to dismiss without converting it to a motion for summary judgment, here, Mr. Sieving disputes the authenticity of the version of the policy Continental attached. *See* ECF No. 33 at 2. "Because the polic[y] [is] not 'concededly authentic,' it would be unfair to consider [it] in conjunction with the defendant's motion to dismiss." *Hallie v. Wells Fargo Bank, N.A.*, No. 2:12-cv-235, 2013 WL 3872814, at *2 (N.D. Ind. July 24, 2013) (citing *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002)); *accord Wells Fargo Bank, N.A. v. Worldwide Shrimp Co.*, No. 17 CV 4723, 2019 WL 4189480, at *3-4 (N.D. Ill. Sept. 4, 2019). Accordingly, for instant purposes, I

premiums because of age or health. We can, however, change the Insured's premiums based on his or her premium class, but only if We change the premiums for all other Insureds in the same premium class." ECF No. 1 ¶ 23.

Mr. Sieving alleges that he reviewed and relied upon a marketing brochure issued by Continental at the time he purchased his certificate. *Id.* ¶ 30. The marketing brochure provided, with respect to premium changes:

> LEVEL PREMIUM RATES DO NOT INCREASE JUST BECAUSE YOU GROW OLDER
>
> Since your premium is based on a fixed daily benefit and on your age at the time you apply, CNA [Continental] can predict the appropriate premium to charge you. As a result, premiums are expected to remain level over your lifetime. CNA reserves the right to change premiums for the entire plan if necessary based on our experience, but you can never be singled out for a rate increase because you get older, become ill, or file claims.

*Id.* ¶ 29. In an outline of coverage attached to the brochure, Continental also included the following language:

> OUR RIGHT TO CHANGE THE PREMIUM. Your premium is based on your age on your application date. Your premium will

---

consider only the portions of the policy that were cited in the complaint.

> not increase because you grow older.  It will remain the
> same unless the rates are increased for everyone in your
> age group; you cannot be singled out for a rate increase
> for any reason.

*Id.* ¶ 34.  The brochure also featured rate tables showing premium
amounts based on age at the time of purchase and benefit level.
*Id.* ¶ 37.

In addition, the brochure included a section describing the
two available inflation-protection options available under the
policy.  Under the first option, called the "Future Purchase
Option" feature, the insured would be given an opportunity to
increase benefits every three years, which he or she could accept
or decline.  The benefit increase would trigger a premium increase
based on the insured's age at the time of the increase.  The second
option, which Mr. Sieving selected, was called the "Automatic
Benefit Increase Option."  That option was described as follows:

> For an additional fixed premium, this allows your
> benefits to increase automatically every year.  If you
> choose this option, your daily Nursing Home and
> Community Based Care Benefits and your Lifetime Maximum
> Benefit Amount will all increase by 5% per year,
> compounded annually for as long as you are insured, with
> no corresponding annual increase in premium and without

> further proof of insurability, even while you are
> withdrawing benefits.

*Id.* ¶ 67. The brochure included a pro and con section for the automatic benefit increases, listing as pros "Level, easy to budget premium," and "Benefits go up every year without corresponding premium increases." *Id.* ¶ 68.

Mr. Sieving's premiums did not increase for thirteen years. However, on September 1, 2016, Continental sent a letter to Mr. Sieving informing him that his premium would increase by 95.5%, with a 70% increase occurring as of November 1, 2016, and a 15% increase occurring November 1, 2017. In a Frequently Asked Questions section appended to the letter, Continental included the following language:

> 6. Will the premium rate increase be effective for
> everyone?
>
> Since Continental Casualty Company (CCC) must receive
> approval or authorization from certain states prior to
> implementing an increase, it is possible that these
> states will not approve or authorize the same percentage
> increase or authorize an increase at the same time. It
> is also possible some states may deny CCC's request for
> an increase, or require it be reduced or spread over
> multiple years. . . . Premium increases will be
> staggered in accordance with the timing of regulatory

>approvals or authorizations and method of premium
>payment.

*Id.* ¶ 42.

Mr. Sieving alleges that this was the first time Continental disclosed that a "premium increase is not uniform for everyone in the same age group or premium class." *Id.* He also contends that Continental misled him into believing premiums would remain constant for those who purchased inflation protection with automatic benefit increases. *Id.* ¶ 64. Mr. Sieving brings the instant class action asserting six claims for relief, including for breach of contract, fraud, and declaratory and injunctive relief.

## II.

In Count I, Mr. Sieving asserts a claim for breach of contract. He claims that Continental breached the policy both by increasing premiums at different rates for insureds in different states, and by increasing premiums for those who had purchased automatic-benefit-increase inflation protection.

With respect to the breach regarding disparate nationwide rates, Mr. Sieving points to the following language in the insurance policy: "We can . . . change the Insured's premiums based on his or her premium class, *but only if We change the premiums for all other Insureds in the same premium class.*" ECF No. 1 ¶ 23 (emphasis added). "Premium class" is nowhere defined

in the policy. *Id.* ¶ 26. Mr. Sieving argues that "premium class" can only mean "the nationwide pool of insureds under the group insurance plan within a given age group." *Id.* Continental argues that it was not empowered to raise rates consistently nationwide because of the state-by-state regulatory framework. Accordingly, because "[i]t is presumed that parties contract with knowledge of the existing law," *Bray v. Archer-Daniels-Midland Co.*, 676 N.E.2d 1295, 1303 (Ill. 1997), "premium class" cannot refer to a nationwide group.

I conclude that on the record currently before me, the term "premium class" is ambiguous. "A policy is ambiguous if it is subject to more than one reasonable interpretation." *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 998 (7th Cir. 2018) (citing *Thompson v. Gordon*, 948 N.E.2d 39, 48 (Ill. 2011)). "Undefined terms are construed as an 'average, ordinary, normal, and reasonable person' would understand them" in the context of the contract "as a whole." *Id.*

Mr. Sieving has presented one plausible interpretation of the policy—that Continental promised not to raise premiums unless it could do so for all of the insureds in a particular age group "class" nationwide. Continental was not, as it argues, powerless to promise consistent nationwide premiums, because it could have raised premiums only to the extent allowed by the most restrictive state.

However, "premium class" could also plausibly refer to something else. It could refer to the group of insureds that pay the same premium, whether or not they are in the same age group— for example, an insured who purchased an automatic-benefit-increase option might be in a different class from someone of the same age who purchased at the base rate. It could also be state-specific, as suggested by Continental, especially given the regulations at play. Because there is more than one reasonable interpretation, the term is ambiguous. *See Newman*, 885 F.3d at 999 (finding undefined term "class" in similar long-term care insurance policy to be ambiguous given multiple possible meanings).

Ambiguous contracts are construed against the insurer, but before that principle of construction is applied, the parties may introduce extrinsic evidence bearing on the ambiguous term's meaning. *Id.* at 999-1000. Accordingly, this issue cannot be resolved at the motion-to-dismiss stage. Mr. Sieving's breach-of-contract claim based on Continental's inconsistent nationwide premium increase may proceed.

Mr. Sieving also claims that Continental was contractually precluded from increasing premiums for those who had purchased automatic-benefit-increase inflation protection. Mr. Sieving has not, however, cited to any provision of the insurance policy that he alleges was breached by the rate increase. Instead, he points

9

exclusively to language contained in the marketing brochure he consulted when purchasing his certificate.

Mr. Sieving's failure to identify a breach of the policy's language does not, however, by itself doom Mr. Sieving's breach-of-contract claim. Some Illinois courts have held that "a descriptive brochure furnished to an individual insured becomes a part of the insurance contract." *See Dobosz v. State Farm Fire & Cas. Co.*, 458 N.E.2d 611, 613 (Ill. App. Ct. 1983). "The key considerations in making this determination are whether the insured relies on the brochure in procuring the insurance and whether the brochure differs from the policy itself." *Id.* at 614. Who prepared the brochure or marketing material may also be relevant. *Id.* Accordingly, whether the brochure is properly considered part of the insurance contract involves questions of fact, and is not properly resolved at the motion-to-dismiss stage. *See St. Paul Ins. Co. of Ill. v. Armas*, 527 N.E.2d 921, 926 (Ill. App. Ct. 1988).

Assuming for present purposes, however, that the brochure *is* properly considered part of the policy, Mr. Sieving still has not adequately alleged a breach of contract. Mr. Sieving points to the brochure's claim that the automatic benefit increase would increase the benefit amount by 5% annually "with no corresponding annual increase in premium." ECF No. 1 ¶ 67. But "corresponding" is the operative word there—this is a promise that premiums will

10

not increase in step with the automatic annual 5% benefit increase, not a promise that premiums will *never* increase.

Mr. Sieving also notes that in a pro-con section regarding the automatic-benefit-increase option, the brochure listed as a pro: "Level, easy to budget premium." ECF No. 1 ¶ 68. Mr. Sieving argues that this was a promise that premiums would be kept "level"— meaning they could never be increased. But the pro-con section was clearly comparing the automatic-benefit-increase option to the other inflation-protection option, the "Future Purchase Option." *See id.* ¶ 68 (listing as cons "Costs more initially than FPO" and "May not track actual inflation trends as well as FPO"). Compared with the Future Purchase Option, which offers benefit increases with corresponding premium increases, the automatic-benefit-increase option does offer a premium that is more "level"—even if the premium is subject to periodic plan-wide increases. And another use of the word "level" in the brochure is consistent with that interpretation—the brochure provides that "*level* premium rates do not increase just because you grow older" but may be subject to other increases. *Id.* ¶ 29 (emphasis added).

Further, any ambiguity regarding the promise of a "level, easy to budget premium" is resolved when read in conjunction with the brochure's other sections. The brochure provided: "CNA reserves the right to change premiums *for the entire plan* if necessary." *Id.* ¶ 29 (emphasis added). In another conspicuous

11

section under the capitalized heading "OUR RIGHT TO CHANGE THE PREMIUM," it announced that premium rates could be increased "for everyone in your age group." *Id.* ¶ 34. "[T]he entire plan" means the entire plan; "everyone" means everyone. Reading the brochure as a whole, I cannot conclude that Mr. Sieving and other purchasers of the automatic-benefit-increase inflection protection were exempt from rate increases.[2]

For the foregoing reasons, the breach-of-contract claim pertaining to the automatic-benefit-increase inflation protection is dismissed. The breach-of-contract claim may proceed, but only with regard to the purported breach based on Continental's inconsistent nationwide premium increase.

### III.

Mr. Sieving also asserts a claim for breach of the implied covenant of good faith and fair dealing (Count II). However, "Illinois courts are clear that the duty imposed by the covenant of good faith and fair dealing generally does not give rise to a cause of action in tort for breach of that duty." *Woerner v. Bankers Life & Cas. Co.*, 216 F. Supp. 3d 924, 929 (N.D. Ill. 2016)

---

[2] Mr. Sieving also notes that Continental's offer of inflation protection was required, under the Illinois Administrative Code, to "disclose in a conspicuous manner that the premium may change in the future unless the premium is guaranteed to remain constant." Ill. Admin. Code tit. 50, § 2012.80(f). But, as noted above, the disclosures in the brochure were conspicuous. At any rate, Mr. Sieving has brought a claim for breach of contract, not breach of the Illinois Administrative Code.

(citing *Voyles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1130-31 (Ill. 2001)).  Instead of an independent source of liability, the implied covenant of good faith and fair dealing is merely a rule of construction that applies in the context of a breach-of-contract claim.  *Voyles*, 751 N.E.2d at 1131.  Accordingly, Count II is properly dismissed.

IV.

Next, in Count III, Mr. Sieving asserts a cause of action under the Illinois Consumer Fraud and Deceptive Business Practice Act ("ICFA"), 815 Ill. Comp. Stat. 505.  Specifically, Mr. Sieving contends that "Continental's brochure and other marketing materials contained deceptive statements about future premium increases."  ECF No. 1 ¶ 109.

Continental moves to dismiss the ICFA claim on standing grounds.  "[F]or a nonresident plaintiff [such as Mr. Sieving] to have standing under the [ICFA], . . . 'the circumstances that relate to the disputed transaction [must] occur primarily and substantially in Illinois.'"  *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 396 (7th Cir. 2009) (citing *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853-54 (Ill. 2005)).  This is not a "bright-line rule but rather a highly fact-bound inquiry in which no single factor would be dispositive."  *Id.*

Mr. Sieving argues that the transaction occurred "primarily and substantially in Illinois" because (1) Continental is

headquartered in Illinois, and (2) it marketed and sold the insurance policy at issue to Employees Long Term Care Insurance Trust, an Illinois resident. ECF No. 21 at 21. But the ICFA claim at issue here centers around dissemination of the marketing documents, not on negotiating the underlying policy with the Trust. Moreover, "the administration of defendant's business in Illinois is insufficient to give a nonresident plaintiff a claim." *Robinson v. DeVry Educ. Grp., Inc.*, No. 16 CV 7447, 2018 WL 828050, at *4 (N.D. Ill. Feb. 12, 2018) (citing *Crichton*, 576 F.3d at 397). And even assuming the marketing documents were written at and circulated from Continental's headquarters in Illinois, "[t]he dissemination of a scheme to defraud from Illinois headquarters is not dispositive either." *Id.* (citing *Avery*, 835 N.E.2d at 855).

The complaint alleges Mr. Sieving was a California resident at the time he purchased his policy certificate from Continental. ECF No. 1 ¶ 12. Accordingly, he likely received the marketing materials and relied on them in making his decision to purchase the certificate in the State of California. In like circumstances, courts have found a lack of ICFA standing. *See Crichton*, 576 F.3d at 397 (no ICFA standing despite defendant insurance company's "home office" in Illinois where plaintiff "reside[d] in Florida, received promotional insurance materials there, entered into and renewed his insurance there, submitted claims there, and was allegedly deceived there"); *Robinson*, 2018 WL 828050, at *4 (no

ICFA standing despite defendant online university being headquartered in Illinois and maintaining website with allegedly fraudulent content in Illinois where plaintiffs enrolled in university in their respective states and "received the misrepresentations and acted upon them there"). Accordingly, Count III is dismissed.

V.

In Counts IV and V, Mr. Sieving asserts claims for fraud and fraudulent omission. As a threshold matter, the parties dispute whether Illinois or California law governs the fraud claims. I conclude that Illinois law applies.

The rules of the forum state—here, Illinois—apply for purposes of a choice-of-law analysis. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Illinois courts engage in a choice-of-law inquiry "only if there is a conflict between Illinois law and the law of another state such that 'a difference in law will make a difference in the outcome.'" *West Side Salvage, Inc. v. RSUI Indem. Co.*, 878 F.3d 219, 223 (7th Cir. 2017) (citing *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 898 (Ill. 2007)). "The party seeking the choice-of-law determination bears the burden of demonstrating a conflict." *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 905 (Ill. 2014). "If the party fails to establish the existence of such a conflict,

the court applies the law of the forum state." *West Side Salvage*, 878 F.3d at 223.

Here, Continental raised the conflict-of-laws question, so bears the burden to demonstrate an outcome-determinative conflict between Illinois and California law. But Continental identifies no such conflicts, and even concedes that "the relevant elements of plaintiff's fraud claims are similar under Illinois and California law." ECF No. 25 at 2. Accordingly, Illinois law will apply.

> To state a fraud claim in Illinois, a plaintiff must allege: (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance.

*Newman*, 885 F.3d at 1003 (citing *Doe v. Dilling*, 888 N.E.2d 24, 35-36 (Ill. 2008)). To state a claim for fraudulent concealment, rather than a false statement, "a plaintiff must allege that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff." *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 737 (7th Cir. 2017) (citing *Connick v. Suzuki Motor Co. Ltd.*, 675 N.E.2d 584, 593 (Ill. 1996)). Mr. Sieving alleges that Continental's marketing materials contained fraudulent statements

and omissions because (1) Continental knew that it would not uniformly increase premiums from one state to the next, and (2) Continental knew that it might or would raise premiums for purchasers of the automatic-benefit-increase option.

I turn first to Mr. Sieving's fraud claims regarding the inconsistent nationwide premium increases. Continental argues initially that Mr. Sieving did not allege any false statement. But Mr. Sieving pleaded that Continental's marketing brochure provided premiums would remain the same unless increased "for everyone in your age group." ECF No. 1 ¶ 34. The brochure also provided that Continental could raise premiums "for the entire plan," and included tables showing premium rates that appeared to be based only on age and benefit level, rather than on state of residence. *Id.* ¶¶ 29, 37. The brochure, thus, could rationally be read to suggest that premium rates would be the same for all individuals covered under the policy within the same age group—regardless of their state. That is enough to plead falsity. *See, e.g.*, *Newman*, 885 F.3d at 1001, 1003.

Mr. Sieving has also sufficiently pleaded knowledge. "In Illinois, a defendant knowingly misrepresents a fact if it makes a statement 'with reckless disregard for its truth or falsity.'" *Id.* at 1003 (citing *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 538 N.E.2d 530, 536 (Ill. 1989)). Continental portrayed its policy as one that offered uniform nationwide premiums, and Mr.

17

Sieving alleged that it did so in bad faith, knowing that in light of the state-by-state regulatory framework, it would not honor that representation. Accordingly, Mr. Sieving has satisfied the knowledge element. *See id.* (knowledge element sufficiently pleaded where plaintiff alleged that defendant insurance company, in bad faith, portrayed policy as one that offered a fixed premium).

Continental also argues that Mr. Sieving failed to plausibly allege reasonable reliance. It contends that because contracting parties are assumed to know the law, it would not be reasonable for Mr. Sieving to rely on any statements guaranteeing uniform premium increases. ECF No. 16 at 21. But, as noted above, the state regulations do not, in and of themselves, necessitate that premium increases are implemented on a non-uniform basis; Continental could have chosen to limit its premium increases to those permitted by the most restrictive state. Accordingly, the state regulations do not necessarily conflict with a promise of uniformity.

Finally, Continental argues that the fraudulent concealment claim should be dismissed because Continental did not have a duty to disclose that it would not uniformly increase premiums nationwide. It is true that no duty to disclose likely arises here based on a fiduciary relationship or a relationship of trust and confidence between Continental and Mr. Sieving. *See Toulon*,

18

877 F.3d at 737-38. However, a duty to disclose may also arise "when a defendant makes a statement 'that it passes off as the whole truth while omitting material facts that render the statement a misleading "half-truth."'" *Newman*, 885 F.3d at 1004 (citing *Crichton*, 576 F.3d at 397-98). Here, Continental provided that it could raise premiums "for the entire plan," ECF No. 1 ¶ 29, or for "everyone in your age group," *id.* ¶ 34, while omitting that premium increases could vary significantly based on the certificate holder's state of residency. That is enough to establish a duty to disclose at the pleading stage. *See Newman*, 885 F.3d at 1004. Accordingly, Mr. Sieving's fraud and fraudulent-concealment claims pertaining to non-uniform nationwide premium increases may proceed.

Mr. Sieving also claims fraud and fraudulent concealment on the grounds that Continental's marketing materials deceptively suggested that purchasers of the automatic-benefit-increase inflation protection would not be subject to premium increases. However, for the reasons discussed above, the brochure was not false or misleading. The brochure provided that Continental could "change premiums for the entire plan if necessary," ECF No. 1 ¶ 29, and under the capitalized heading "OUR RIGHT TO CHANGE THE PREMIUM," it announced that premium rates could be increased "for everyone in your age group," *id.* ¶ 34. There was no indication that purchasers of the automatic-benefit-increase option were

exempt. This is a situation "in which the consumer [wa]s warned about the undesirable result and simply misconstrue[d] the material offered by the insurance company." *See Newman*, 885 F.3d at 1001. I find no falsity or misleading half-truth. Accordingly, to the extent Counts IV and V pertain to Mr. Sieving's claims regarding the automatic-benefit-increase inflation protection, they are dismissed.

VI.

Finally, Continental moves to dismiss Mr. Sieving's claim for declaratory and injunctive relief in Count VI. Count VI is properly dismissed because "requests for declaratory judgment and injunctions are not independent causes of action." *Elward v. Electrolux Home Prods., Inc.*, 214 F. Supp. 3d 701, 708 (N.D. Ill. 2016); *see also Mohammad v. IndyMac Bank, F.S.B./One West Bank, F.S.B.*, No. 16 C 7241, 2018 WL 1252112, at *6 (N.D. Ill. Mar. 12, 2018). "It is well established that the Declaratory Judgment Act does not create an independent cause of action. It provides only an additional form of relief." *Morris v. Mfrs. Life Ins. Co.*, No. EV 95-142-C H/H, 1997 WL 534156, at *10 (S.D. Ind. Aug. 6, 1997); *see also Keesler v. Electrolux Home Prods., Inc.*, No. 16 C 199, 2016 WL 3940114, at *3 (N.D. Ill. July 21, 2016). Similarly, "[a]n injunction is a type of remedy, . . . as distinct from an underlying claim for relief." *Onyango v. Downtown Entm't, LLC*, 525 F. App'x 458, 460 (7th Cir. 2013).

20

Continental seems to argue that above and beyond Count VI's dismissal, however, Mr. Sieving should be precluded from seeking an injunction in his prayer for relief. It contends that Mr. Sieving has an adequate remedy at law because plaintiffs' injury "is easily remedied by an award of money damages." ECF No. 16 at 26 (citing *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011)). But Mr. Sieving seeks to prevent Continental from "increasing long-term care insurance premiums by amounts that vary state-to-state" *in the future*. ECF No. 1 ¶ 141. Accordingly, I am not convinced at this stage that damages would be an adequate remedy at law. *See In re Experian Data Breach Litig.*, No. SACV 15-1592 AG (DFMx), 2016 WL 7973595, at *7 (C.D. Cal. Dec. 29, 2016) (applying Illinois law and denying motion to dismiss claim seeking injunction to protect plaintiffs against future data breaches even if damages were sufficient to compensate for prior breach); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1220 (C.D. Cal. 2007) ("[A] legal remedy is inadequate if it would require a 'multiplicity of suits.'"); *see also Almond v. Capital Props., Inc.*, 212 F.3d 20, 25 (1st Cir. 2000) ("[I]njunctions against contract breach are common where there is some reasonable doubt about whether damages can be sufficient [and] that assessment ordinarily turns very much on the facts.").

VII.

For the foregoing reasons, the motion to dismiss [15] is granted in part and denied in part. Counts II, III, and VI are dismissed. Counts I, IV, and V may proceed insofar as they pertain to inconsistent nationwide premium increases, but are dismissed to the extent they pertain to the automatic-benefit-increase inflation protection.

ENTER ORDER:

**Elaine E. Bucklo**
United States District Judge

Dated: April 26, 2021